## SCHOOL BOARD OF DADE COUNTY v. CARR
Case No. 83-1035

State of Florida Division of Administrative Hearings

October 11, 1984

### APPEARANCES OF COUNSEL

**Madelyn P. Schere** and **Phyllis O. Douglas**, and **Jesse J. McCrary, Jr.,** of **McCrary and Valentine**, for Petitioner.

**William DuFresne** and **Ellen L. Leesfield** for Respondent.

### OPINION OF THE COURT

SHARYN L. SMITH, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, Sharyn L. Smith, held a formal hearing in this case on November 14, 1983, and March 6, 1983, in Miami, Florida.

The issues for determination at the final hearing were: (1) whether Respondent's tenure should be removed due to good and sufficient

reason, i.e., incompetency; (2) whether the Superintendent's letter to Respondent dated March 23, 1983, meets the statutory requirements of Section 231.26(4)(b), Florida Statutes, and constitutes adequate notice to Respondent Carr of the charges against him; (3) whether Article XXXIII, Section 3A, of the collective bargaining agreement between the Dade County Public Schools and the United Teachers of Dade precludes the School Board from reducing Respondent's contractual status; and (4) whether the School Board must have grounds sufficient to terminate Respondent to remove his tenure.

At the final hearing, Nathaniel Joseph, a student, Timothy Randall, a student, Byron Martin, a student, Karen Bass, a student, Della Zaher, the former principal at Edison Park Elementary School, Jill Witlin, the former assistant principal at Edison Park Elementary School, Jacqueline Hinchey, an Art Supervisor of the Dade County Public Schools, Allen Rothfarb, an Art Specialist for the Dade County Public Schools, and Desmond Patrick Gray, Jr., the Executive Director, Division of Personnel Control for the Dade County Public Schools, testified for the Petitioner School Board. Petitioner's Exhibits 1–16 were offered and all except Exhibit 5, which was withdrawn, and Exhibit 7, which was not admitted, were admitted into evidence. Benjamin Pratt, a teacher, Karen Hutchinson, a teacher, Eugenia Turner, a teacher, and Richard Carr testified for the Respondent. Respondent's Exhibit 1 was offered and admitted into evidence.

Proposed Recommended Orders containing findings of fact have been submitted by the parties and considered in the preparation of this Recommended Order. When the parties' findings of fact were consistent with the weight of the credible evidence introduced at final hearing, they were adopted and are reflected in this Recommended Order. To the extent that the findings were not consistent with the weight of the credible evidence, they have been either rejected or when possible, modified to conform to the evidence. Additionally, proposed findings which were subordinate, cumulative, immaterial or unnecessary have not been adopted.

## ROCEDURAL BACKGROUND

By letter dated March 23, 1983, the Superintendent of Schools for the Dade County Public Schools, Leonard Britton, notified Respondent that he would recommend at the next scheduled meeting of the School Board on March 30, 1983, that Respondent's continuing contract status be removed and that he be returned to annual contract status, "for just cause including, but not limited to, incompetency, effective for the 1983-1984 school fiscal year."

On March 30, 1983, the School Board voted to remove the continuing contract of Respondent.

By letter dated March 31, 1983, Respondent was notified of the School Board action by letter signed by Patrick Gray, as Executive Director, Division of Personnel Control for the Dade County Public Schools.

By letter dated March 31, 1983, counsel for Respondent Carr timely requested a hearing on the charges. The case was transferred to the Division of Administrative Hearings, and a notice of hearing was mailed by the Hearing Officer to the parties on May 5, 1983.

On May 13, 1983, the attorney for the School Board filed a notice of charges alleging incidents of corporal punishment in 1977 and 1978 and, in paragraph 10, ". . . just cause including, but not limited to, incompetency . . . ." On May 27, 1983, the attorney for the Petitioner filed its First Amended Notice of Charges to include an incident of battery upon a student which occurred in 1982, ". . . . in addition to the acts alleged in Paragraphs One (1) through Ten (10) in the original Notice of Charges."

A second Notice of Hearing was mailed to the parties by the Hearing Officer on August 3, 1983. Upon motion of Petitioner, the hearing was reset for November 14, 1983.

On October 14, 1983, the attorney for Petitioner filed a Seconded Amended Notice of Charges "incorporat(ing) by reference all previous charges filed . . ." The Second Amended Notice of Charges made more specific allegations concerning the incompetency charge.

Respondent moved to strike Petitioner's Second Amended Notice of Charges. A telephone conference was held and the Motion to Strike was denied, but the hearing was ordered bifurcated, with the "corporal punishment charges" to be heard at the November 14, 1983, hearing and the remainder of the incompetency charges to be set down for a later hearing.

Hearings were held on November 14, 1983, and on March 6, 1984. On February 7, 1984, Petitioner filed a Third Amended Notice of Charges alleging "good and sufficient reason, including, but not limited to, incompetency and misconduct in office, . . .". Said notice incorporated by reference all previous charges filed in the case.

At the hearing held on November 14, 1983, paragraphs 4, 5, 6, and 7 of the First Notice of Charges were withdrawn by the School Board.

## FINDINGS OF FACT

The Respondent Carr has been employed as an art teacher for the

School Board of Dade County, Florida, since approximately 1972. He has taught at the senior high, middle school, and elementary school levels. He obtained tenure during 1976 or 1977. He has had varying levels of success according to his official performance evaluation ratings that are contained in his personnel file. In all but three years of his service, his annual evaluations have contained at least one category that was at or below an acceptable level of teaching in the Dade County Schools. Since the 1979–80 school year, the Respondent has received unacceptable ratings in three out of eight evaluative criteria on his annual evaluations.

Respondent Carr has been the subject of personnel investigations on five different occasions, each involving the alleged use of physical contact beyond what is normally acceptable with students. Three instances of misuse of physical contact/corporal punishment were tried at the November 14, 1983, hearing.

In the first incident which occurred in September, 1978, the Respondent came up behind a student and placed his hand in the student's hair in order to remove him from a classroom. From that point forward, it is unclear exactly what occurred since the incident which happened five years prior to the hearing could not be specifically recalled by the student. The student did, however, swing his arms at the Respondent in order to release the Respondent's grasp on the back of his head.

In the second incident which also occurred in September, 1978, Respondent reached across student Byron Martin's desk with a pole or a stick and tapped the student on the head. The Respondent did not hurt the student who testified at the final hearing that other people made a bigger issue out of the incident than he did.

In the final incident, during October or November, 1982, the Respondent turned the head of a student Karen Bass, a nine-year-old girl, in order to get her attention. Karen became scared and began to cry. The Respondent did not intend to strike or frighten Karen, but turned her head to try and prevent her from being distracted by another student.

Respondent was formally observed by the assistant principal of Edison Park Elementary School, Jill Witlin, on May 15, 1980. He was found to be overall unacceptable and specifically unacceptable in the categories of classroom management, techniques of instruction, and teacher-student relationships.

The Respondent was marked unacceptable in classroom management because he was not able to manage the classroom. The students did not

**197**

respond to him. They did not follow his directions or do what he asked them to do. As he became frustrated with the class, he would use sarcasm and cynicism.

The Respondent addressed the students in an angry manner and did not seem to know their names. At times he would bring students to the office, pushing them toward the assistant principal saying that he could not deal with them. This is an inappropriate way to handle students because it lets students know that a teacher cannot deal with them, lets them see the teacher's frustrations, and is a misuse of physical force. A teacher is required to have the skills and techniques for dealing with students calmly, despite emotions.

Mrs. Witlin rated Respondent unacceptable in techniques of instruction because Respondent dealt with very technical kinds of instruction without following conventional, developmental learning modes of children. The lesson was too heavily teacher-directed and Respondent was very concerned with the ultimate art product. His instruction was very technical without giving the children any sense of where they were headed. This is not an appropriate way to teach elementary school children. Such children learn best when they have some sense of what they are doing and why they are doing it, rather than just following instructions.

Respondent taught above the level of the children and used vocabulary and instructions that were too difficult for them to understand.

There were times when Respondent did not use CurriculArt. There were other times when he did use CurriculArt but he did not fulfill many of the aspects of what the CurriculArt manual suggested.

Respondent was marked unacceptable in teacher-student relationships because he talked to the students in a harsh manner. He did not know the names of his students so he called them "Boy" or "Girl." He referred to the students in a negative manner and did not have a good opinion of what they could accomplish or learn. He was negative toward what they knew and what they could produce. He was also negative about their behavior. There was screaming coming from his room that could be heard in the hallways. Respondent could be heard saying "shut up" to his students.

Respondent would make negative comments about students in front of other students. This is inappropriate because it can damage a child's self-concept, does not provide a proper role model for a child, and makes the teacher immediately lose his position as an authority figure. As a result, some of the Respondent's art students did not want to go to his class at all.

198

On Respondent's annual evaluation, although he received three unacceptable categories, he was recommended for employment the following year.

His classroom management was unacceptable because he spent a great deal of time at the outset of classroom time lecturing students about their behavior from the previous week's class. He took up 10 to 15 minutes of instruction time doing this. Once he got the class started, the students lacked direction and walked around the room not knowing what their particular task was. Respondent had great difficulty in keeping their interest and keeping everyone on task. At times the room became so noisy that Respondent had to scream and yell in an attempt to get the class under control. The class got progressively worse as the classroom time extended.

The Respondent was marked unacceptable in teacher-student relationships because he had difficulty in working with students in a positive manner. He name-called and belittled students in front of other students. He said such things as "stupid" and "you are stupid" and "you really don't know what you are talking about; you are no good." These statements are demoralizing and ridiculing to students in front of other students. His instructional techniques did not motivate and enable students to learn.

Respondent was next formally evaluated by his principal, Della Zaher, on June 16, 1981. He was found to be overall unacceptable and was rated unacceptable in the categories of preparation and planning, knowledge of the subject matter, classroom management, techniques of instruction, assessment techniques, and teacher-student relationships.

Respondent was marked unacceptable in preparation and planning because he did not have his materials ready for this particular class. He began the class by talking about the children's negative behavior from the week before. Then he spent a good portion of the class time trying to retrieve the materials and getting them ready for the classroom instruction. In the meantime, the children became disruptive because of the time that Respondent had taken for this preparation.

Respondent was marked unacceptable in knowledge of the subject matter because his vocabulary was overly advanced for elementary-age children and they had no idea what he was saying. The students did not understand the intent of the lesson. Most of the time, they were sitting idle, not comprehending the lesson. This led to unacceptable classroom management.

Respondent was marked unacceptable in classroom management

199

because of his negative and sarcastic comments to the children. There was no mutual respect on the part of the children or the teacher. If the children did not follow exactly what was presented to them, he would tear up their papers and throw them in the wastebasket.

When the children did their tasks incorrectly, Respondent could be heard outside of his classroom scolding his students even with the door closed. The children were not in their seats and were not working on the lesson. The entire classroom period was devoted to this type of disruptive behavior. Respondent could not correct the children by calling their names because he apparently did not know their names although he could have learned their names through the use of a seating chart or name tags. Other teachers who taught special classes, and who had as many students as Respondent, did not have the same difficulty ascertaining the names of the children. Respondent did not improve in his knowledge of the children's names by the end of the school term or from year to year when he had many of the same children again.

Respondent was marked unacceptable in techniques of instruction because he did not have a way of explaining the assignments and giving clear instructions to his students. He never completed a task on time because he took too much classroom time disciplining the students and telling them about their behavior from the previous week. Because of this, he did not finish his lessons. The endings of his class periods were chaotic.

Respondent was marked unacceptable in assessment techniques because of the manner in which he graded students' papers. He used a random assessment technique. There was no consistency in grading procedures. He would have the students stand up and show their papers and he would try to grade them. This technique can be ridiculing to students. There was very little meaning in the lesson for the children because he did not explain to them why they got the grades they got. He never completed an entire class and he spent a great deal of the class time at the end of the period trying to record grades. The students who were not being graded were disruptive.

The Respondent kept no individual folders on the students where a student's progress could be monitored; instead, the papers were placed in a stack of papers in a closet. With Respondent's lack of a paper filing system, it would be impossible to explain to a parent why a child got a particular grade on his report card. His grade book was not up-to-date and he did not have sufficient grades for each child.

Respondent was also marked unacceptable in student-teacher rela-

200

tionships because of his continual negative approach. Respondent did not indicate any real respect for each individual child in his classroom. There were some students who did not want to go to art class. In every conference that Respondent had with the principal, Respondent reminded her that black children could not learn. He also stated this belief to Ms. Witlin in that he felt the schools were spinning their wheels and wasting their time working in a low income, black area.

Respondent was marked unsatisfactory in professional responsibility because he had difficulty turning his grades in on time so that the classroom teachers could record the students' art grades on their report cards.

Respondent was again recommended for employment on his annual evaluation for the 1980–81 school year, although he was rated unacceptable in the categories of classroom management, techniques of instruction, and teacher-student relationships. He was recommended for reemployment because he had shown some improvement and the principal was interested in trying to improve his instructional techniques and his classroom instruction.

Respondent was next formally observed by his principal, Mrs. Zaher, on September 25, 1981. While Respondent was marked overall acceptable, he was still unacceptable in classroom management, teacher-student relationships, and in one subcategory of preparation and planning.

Respondent was unacceptable in classroom management because his voice was still very loud. He would almost lose complete control when he could not get the students' attention. He still began the class by lecturing to them about their behavior from the previous week. He did not have the materials ready to begin the lesson which added to the poor classroom management and resulted in more disruption. The children became disruptive each time Respondent had to retrieve supplies.

Respondent was marked unacceptable in teacher-student relationships because he was unaware of the lack of student interest and other individual differences which caused students to be disruptive.

Respondent was next formally observed by Ms. Witlin on October 23, 1981. Although he was found to be overall acceptable, this observation was a result of priming by Ms. Witlin. She met with Respondent early in the year to go over the observation form in great detail prior to the actual observation in an attempt to show him exactly what she would be looking for. He followed through on many of the things she had suggested. As a result, the lesson was acceptable.

The next formal observation was performed by Jacqueline Hinchey,

201

Art Supervisor for the Dade County Public Schools. Ms. Hinchey was called in to give advice to Respondent. She attempted to be as positive as possible. She rated the Respondent acceptable even in borderline areas in her attempt to be helpful and positive.

Ms. Hinchey rated the Respondent overall acceptable. She felt that while he had made strides in improving his instructional techniques and public relations strategies, his knowledge of child development was still very limited. The major shortcoming of his teaching was that because he did not understand how children grew, he was unable to level his knowledge in a manner so that the children could understand and be able to succeed. Because of his lack of understanding how children grew, he had unreal expectations of them. This resulted in his will being pitted against the children's will. As a result, Respondent became angry. The children were not doing what he expected them to do or what he wanted them to do or they could not do it, and he, therefore, became angry.

He was not using CurriculArt. CurriculArt is a School Board-approved program which incorporates the School Board's balanced curriculum. A teacher is required to use CurriculArt unless he has submitted a different, but acceptable, program to Ms. Hinchey. Since no school in the county has submitted an alternate curriculum, it would be expected that all art teachers, including Respondent, would be using CurriculArt.

Respondent was still assessing the children's work by having them hold up their work, and he would say that one child's work was the best. This is not an appropriate assessment technique because he did not explain why a work was the best and also makes the other children feel inadequate.

The Respondent tended to talk too long and his demonstrations were too technical and detained for the age group with which he was working. Since not all the children could see his demonstration, they would begin to get fidgety.

Respondent was recommended for reemployment at the end of the 1981–82 school year. Although Respondent needed to improve his techniques of instruction, he was showing some improvement.

Respondent was next formally observed by Ms. Witlin on November 15, 1982. He was found to be overall unacceptable and was rated unacceptable in one subcategory of preparation and planning and in the areas of techniques of instruction, assessment techniques, and professional responsibility.

Respondent was marked unacceptable in Part A of preparation and

202

planning because while his planning was done, the lesson was not an effective one. He needed to plan his lesson in much greater detail in terms of what he wanted to accomplish, what time frames he would use, and what specific actions he would take. Respondent was still not using CurriculArt.

Respondent was marked unacceptable in techniques of instruction because he did not accept student responses and utilize students' ideas, and he did not vary instructional strategies or adapt his methodology to different students.

Respondent was marked unacceptable in assessment techniques because art projects were not graded and were not organized into portfolios. There were insufficient grades in the grade book. There was no ongoing regular assessment week after week and the assessment was irregular.

Respondent was marked unacceptable in professional responsibility because there were consistent delays in getting his art grades to the homeroom teachers. If Respondent would have kept up with his grades on a weekly basis and had averaged them, he would not have had a problem getting his grades to the homeroom teachers. He had to rush to get the grades in to the teachers at the last minute and as a result, the other teachers bothered the assistant principal for them all day long on the teacher workday. This was not a professional way to operate. Further, Respondent's room was very disorganized, messy, and uninviting.

The next formal observation was performed by Ms. Witlin approximately a week and a half after her last observation. This observation took place on November 24, 1982. While his progress was not fully acceptable, there was progress over the prior observations. Ms. Witlin wanted to encourage Respondent's use of CurriculArt which she had prescribed in the prior observation.

His classroom management was unacceptable because he spent an inordinate amount of time introducing the lesson, preparing the materials for it and following the CurriculArt card to the letter. He began to lose track of time. He was not able to pace the lesson properly and when he told the children to stop doing their work they did not listen to him. As time ran out and things started to unravel, the Respondent became frustrated. Classroom discipline broke down badly. He was marked unacceptable in a subcategory D of techniques of instruction because he did not give ample time for cleanup, or organization of materials, and for putting away art products.

The next formal observation was performed by Ms. Zaher on

**203**

December 14, 1982. Respondent was rated overall unacceptable and was found to be unacceptable in classroom management, techniques of instruction, and in one subcategory of preparation and planning.

He was found unacceptable in category C of preparation and planning because he did not arrange for the distribution of materials in an effective manner, and he did not begin his lesson on time. He would begin his lesson by spending time talking about the children's behavior from the prior weeks. He was never able to complete a lesson because of the time taken to discipline the children and to give instructions as to how they should behave.

Respondent was marked unacceptable in classroom management because he never got the class under control. He ran out of time and did not complete grading. He did not close his lesson. He spent too much time trying to get the classroom under control. Students were out of their seats running around the room and exhibiting disruptive behavior.

Respondent was marked unacceptable in techniques of instruction because the children had no time to finish their lesson and clean up. Respondent lost instructional time because of disruptiveness.

Although Respondent was rated acceptable in assessment techniques, he was still shouting out grades in front of the whole class, and taking up a great deal of time trying to grade the children.

The next formal observation was performed by Ms. Hinchey on January 10, 1983. He was rated overall unacceptable and was unacceptable in the areas of classroom management, techniques of instruction, and teacher-student relationships. Respondent deteriorated in his teacher-student relationships and in his teaching techniques since Ms. Hinchey's prior observations.

Teacher-student relationships was marked unsatisfactory, because Respondent frequently appeared and sounded angry with his students. He still did not know the names of the students and pointed or gestured at the students when he wanted them. The students became fidgety and began to nudge each other and whisper. The more this happened, the more upset Respondent became. He gave the students angry looks and raised his voice.

Techniques of instruction was marked unsatisfactory because one-third of the class could not see a demonstration rubbing. As a result, the children did not get the idea of what a rubbing is. They did not get the idea of repeating the shapes on the page and there was no planned critiques at the end of the lesson so that the children could see if they understood the goals of the lesson.

204

Respondent was still assessing the students' work by choosing the best one at the table. Respondent was using the CurriculArt card but the lesson was misleveled and the lesson was very minimal.

During the many informal observations of Respondent, he fared no better. He had the same kinds of problems that he had on the formal observations. He was having trouble in all of his classes and he was frustrated and angry with his students.

The administration has attempted to help Respondent improve his teaching. Since Respondent had been having difficulties in his prior school assignment, Ms. Hinchey recommended that he be placed in the elementary level where there was more structure and a curriculum that could easily be followed. She recommended that he be put with an administrator who was known to be a helping person and someone who would patiently work with him. Her recommendation was that Respondent be placed with Della Zaher at Edison Park Elementary. Ms. Zaher had a reputation of being an administrator who could get along with individuals and would try to work with them closely to get the best out of them.

After various classroom observations, the administrator prescribed various means of help for the Respondent. It was recommended that Respondent observe two good art teachers in other inner-city elementary schools in order to see that it was possible to get good control from these students. An assertive discipline workshop was also prescribed for the Respondent. It was recommended to Respondent that he take the time to learn the students' names. The administrators recommended that Respondent establish classroom rules, enforce them, and use behavior modification techniques. Conferences were held with Respondent in order to help him improve. It was suggested that Respondent meet with the counselor of the school in order to learn positive techniques for motivating student interest and for learning techniques to control student behavior in a positive way. It was recommended that Respondent attend workshops. It was recommended that he tape his own lessons to hear how he addresses students so that he would be aware that he was not getting the response that he wanted. Ms. Witlin asked Respondent to discuss his feelings about the students and to take a humanistic attitude toward the children and to observe a variety of teachers at Edison Park, teachers of the young, and teachers of old, and teachers of ethnic groups to see how pleasantly and positively they got along with the students. In early October, 1981, as discussed above, Ms. Witlin gave Respondent extra help prior to his November 15, 1982, observation in order to help him reach an

acceptable observation. After the November 15, 1982, observation, it was prescribed that Respondent begin to use CurriculArt. Ms Witlin developed an elaborate procedure in order to help the special teachers get their grades to the homeroom teachers on workdays. Ms. Zaher brought in the art supervisor, Jacqueline Hinchey, to give advice to Respondent. Ms. Hinchey recommended the CurriculArt workshops for Respondent. She also recommended that the area art consultant and the assistant principal work with Respondent. The area art consultant worked specifically with Respondent in the areas of classroom management and planning five or six times during the 1982-83 school year. He assisted Respondent with planning and did a demonstration lesson for Respondent. The art consultant recommended the two teachers whom Respondent was to visit in the other schools.

None of these prescriptions seemed to improve Respondent's performance. As a final attempt to offer Respondent an opportunity to improve his teaching, Ms. Zaher recommended a reduction from continuing contract to annual contract status. She felt that if he would understand that the school system meant serious business, Respondent would do something about his teaching. This was the last remedial action, a final opportunity for Respondent to improve his teaching while on a probationary status and placing the burden of competent performance on him.

On December 17, 1982, Ms. Zaher put Respondent on notice that he had not sufficiently improved in the areas of planning, classroom management, and techniques of instruction and assessment. At that time, she could not recommend him for continuing contract status. She indicated that in order to be recommended for continuing contract by February 25, 1983, there must be improvement as indicated in her memo. On February 9, 1983, Ms. Zaher notified Respondent that she would be recommending that he be returned to annual contract status for the 1983-84 school year since the standard of performance indicated on her memo of December 17 had not been achieved. At a conference-for-the-record with the Executive Director, Division of Personnel Control of the Dade County Public Schools, on March 14, 1983, the charges were made known to the Respondent, and his prior investigative reports were reviewed.

It is the consensus of opinion of the administrators who observed Respondent that the students in Respondent's class did not receive the minimal amount of educational experience to which they were entitled. There was a repeated failure on the part of Respondent to communicate with and relate to the children in his art room to such an extent that they were deprived a minimum educational experience. The art

206

experience was a very negative experience for his students. Although Respondent is intelligent and knows his subject matter, he is a poor teacher.

On March 23, 1983, the Superintendent of Schools notified Respondent that he would recommend to the School Board at its next regularly scheduled meeting on March 30, 1983, that Respondent's continuing contract be removed and that he be returned to annual contract status for the 1983-84 school year. The Superintendent's letter indicated a right to a hearing and a time frame within which to exercise that right. It also contained a copy of the charges, to wit:

. . . for just cause including, but not limited to, incompetency. . . .

On March 30, 1983, the Superintendent filed his written recommendation with the School Board, and the School Board acted to remove the continuing contract of Respondent and to return him to annual contract status effective for the 1983-84 school year.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and subject matter of this proceeding. Section 120.57(1), Florida Statutes.

The Respondent is charged with violating Section 231.36(4)(b), Florida Statutes which provides in pertinent part as follows:

Any member of the district . . . instructional staff, . . . who is under continuing contract may be dismissed or may be returned to annual contract status for another 3 years at the discretion of the school board, at the end of the school year, *when a recommendation to that effect is submitted in writing to the school board on or before April 1 of any school year, giving good and sufficient reasons therefore, by the superintendent, by the principal . . . or by a majority of the school board. The employee whose contract is under consideration shall be duly notified in writing by the party or parties preferring the charges at least 5 days prior to the filing of the written recommendation to the school board.* The school board shall proceed to take appropriate action. Any decision adverse to the employee shall be made by a majority vote of the full membership of the school board. Any such decision adverse to the employee may be appealed by the employee pursuant to Section 120.68. (emphasis added)

The Petitioner established that the Respondent Carr was incompetent in the area of art education. Incompetency constitutes "good and sufficient reason" to return the Respondent to annual contract status.

Therefore, as to the first issue presented in this case, the Petitioner has demonstrated incompetency by a preponderance of the evidence as defined by Rule 6B-4.04(1), Florida Administrative Code, and the Respondent's tenure should be removed for a good and sufficient reason.

As to the second issue presented, that the Petitioner allegedly failed to meet the statutory requirements of Section 231.36(4)(b), Florida Statutes, by failing to include a copy of the charges in its March 23, 1983 letter to Respondent, this issue must be resolved in favor of the Petitioner.

The March 23rd letter placed the Respondent on notice that he was being charged with incompetency and the prior observations of Respondent, informed him of the specific details of said incompetency. Each Notice of Charges filed by the Petitioner alleged incompetency either by reference to prior pleadings or by specific wording.

Assuming arguendo, that the Superintendent's letter did not fully apprise Respondent of the details of what he was called upon to defend, the facts presented at the hearing established that the charges against the Respondent were well known to him and the subject of repeated remedial efforts instituted by the Petitioner. Counsel for the Respondent was aware of the charges against him and was adequately prepared to defend against all of the Petitioner's allegations. Moreover, prior to the hearing, the Respondent did not seek to particularize the charges against him nor did the Respondent request additional time to prepare for the bifurcated hearing. Under which circumstances, the Respondent has failed to demonstrate that he has been prejudiced by the alleged insufficiencies contained in the notice of the charges. See Section 120.68(8), Florida Statutes.

As to the third issue presented, that the collective bargaining agreement between the Dade County Public Schools and the United Teachers of Dade precludes the School Board from reducing Respondent's contractual status, the Respondent has failed to demonstrate the relevancy of the collective bargaining agreement to these proceedings. Assuming that the Petitioner violated Article XXXIII, Section 3A of the collective bargaining agreement in its dealings with the Respondent, the remedy in such a situation is provided within the collective bargaining. In the instance proceeding, a violation of the collective bargaining agreement does not constitute an affirmative defense to the statutory charges specified in the notices of charges.

Finally, the issue of whether the Petitioner must have grounds sufficient to terminate the Respondent to remove his tenure is moot

due to the conclusion reached initially that the Petitioner established that the Respondent was incompetent in the area of art education.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is recommended:

That a final order be entered by the Petitioner, Dade County School Board, affirming the reduction of contractual status of the Respondent Richard Carr from continuing contract to annual contract status.